Filed 11/9/15  P. v. Castaneda and Cruz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>IVAN CASTANEDA and<br>JESUS VALDIVIA CRUZ,<br><br>  Defendants and Appellants. | G048862<br><br>(Super. Ct. No. 13CF1009)<br><br>O P I N I O N |

Appeals from judgments of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant Ivan Castaneda.

Ronald G. Brower and Mark W. Fredrick for Defendant and Appellant Jesus Valdivia Cruz.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

\*      \*      \*

## INTRODUCTION

A jury convicted Ivan Castaneda and Jesus Valdivia Cruz of the first degree murder of Jose Miguel Quiroz (count 1) and the first degree attempted murder of David Quiroz (count 2). We refer to the victims as Jose and David to avoid confusion. The jury also convicted Castaneda and Cruz each of one count of street terrorism under Penal Code section 186.22, subdivision (a) (count 3). As to counts 1 and 2, and as against both Castaneda and Cruz, the jury found true enhancements alleged under Penal Code section 186.22, subdivision (b)(1) and enhancements alleged under Penal Code section 12022.53, subdivisions (d) and (e)(1). Castaneda and Cruz received the same sentence: 82 years to life in prison.

Castaneda and Cruz were tried and convicted of first degree premeditated murder and first degree attempted murder as aiders and abettors under the natural and probable consequences doctrine. In *People v. Chiu* (2014) 59 Cal.4th 155, 158-159 (*Chiu*), which was issued after the notices of appeal were filed, the California Supreme Court held an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. An aider and abettor's liability for premeditated first degree murder must be based on direct aiding and abetting principles. (*Id.* at p. 159.) Punishment for second degree murder "is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id.* at p. 166.)

2

As a consequence of *Chiu*, the convictions in this case for first degree murder and first degree attempted murder cannot stand. We conclude, however, the evidence was sufficient to hold Castaneda and Cruz liable for second degree murder and second degree attempted murder, and we reject Cruz's contention the prosecutor committed misconduct warranting reversal. On remand, the People may accept a reduction of the convictions to second degree murder and second degree attempted murder or elect to retry the greater offenses. (*Chiu*, *supra*, 59 Cal.4th at p. 168.)

Also as a consequence of *Chiu* and our disposition of this matter, the following arguments raised by Castaneda and Cruz are moot or not ripe for adjudication: (1) the trial court erred by instructing the jury with CALCRIM No. 522 and CALCRIM No. 570 (part II of the argument section of Castaneda's opening brief), (2) the trial court erred by imposing a full consecutive term on count 2 for attempted murder (part III of the argument section of Castaneda's opening brief), and (3) the sentences imposed constitute cruel or unusual punishment in violation of the California Constitution (section VI.B. of Cruz's opening brief).

Cruz joins in Castaneda's arguments. We will deem Castaneda to have joined in Cruz's arguments.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

### I.

### Murder at the Taqueria De Anda Restaurant

At about 2:00 a.m. on July 25, 2010, a gray Lincoln Town Car and a black Chevrolet Suburban arrived at a Taqueria De Anda restaurant in Santa Ana. Inside the vehicles were friends and family members, including Jose and David, who had come

3

from a wedding they had attended earlier that evening and had decided to stop and get a bite to eat.[1] Once everyone had gotten out of the vehicles, Castaneda and Cruz, who had been seen standing in the parking lot, approached them.

Castaneda and Cruz, who were drunk, made hand signs toward the wedding guests. Cruz told them this was his taqueria and his barrio. He yelled, "where you from?" and "Westside Compadres," the name of a street gang. Someone from among the wedding guests replied, "we just want to eat tacos. We don't want any problems." Castaneda shouted he was "Creeper" and told the wedding guests they could not eat at the Taqueria De Anda restaurant because it was in his gang's claimed territory. Two women and a man walked over from a nearby minimart and started arguing with men from the wedding party. One of the wedding guests announced they did not want any trouble and would leave.

The wedding guests walked back to the vehicles. Castaneda and Cruz followed them. Castaneda shouted something in the direction of an alley leading to an apartment complex and appeared as though he was trying to contact someone. An unidentified person made a call on a cell phone.[2] About two to three minutes later, two men, one of whom had a gun tucked under his waistband, appeared from the alley and ran toward the Suburban.

Some of the guests managed to get inside the Suburban. Castaneda opened a door of the Suburban and began to punch David as he sat inside. David struck back and knocked Castaneda to the ground. The Suburban quickly emptied of its occupants, and

---

[1] Evidence was presented at trial to show that none of the wedding guests was affiliated with a gang and nobody had a weapon. Evidence was also presented that several of the wedding guests were affiliated with gangs or tagging crews, or had been involved in criminal activity.

[2] One witness testified that one of the two women who had come from the minimart made the cell phone call. Another witness, Miguel Angel Quiroz, testified that "[t]he third guy" made the phone call.

some of them joined in the fray. Miguel Angel Quiroz and Alejandro Martinez kicked Castaneda when he tried to get up from the ground.

As he was getting out of the Suburban, Miguel Angel Quiroz saw the two men who were running toward the Suburban from the alley. The man carrying the gun ran up behind Castaneda and from there shot David in the stomach. The gunman then fired five shots toward Jose, Alejandro Martinez, and two others, who were standing together about seven feet away. Jose fell to the ground, mortally wounded. The assailants, except for Castaneda, fled. Castaneda, his face bloodied, was left behind lying on the ground.

Santa Ana Police Officer Armando Chacon heard the gunshots and within minutes arrived at the parking lot of the Taqueria De Anda restaurant. He found Jose lifeless. While Chacon was checking Jose's vital signs, David approached, identified himself as the victim's cousin, and displayed a wound to his abdomen. Chacon requested additional police assistance and notified police dispatch that Jose was dead.

Santa Ana Police Officer Maybelline Solideo followed Chacon in her patrol car to the Taqueria De Anda restaurant's parking lot. On arriving at the scene, she saw Jose lying next to a black Chevrolet Suburban and David standing next to the Suburban with his shirt lifted to reveal the wound to his abdomen.

Solideo also saw Castaneda lying on the sidewalk just to the west of the Suburban. She got out of the patrol car and walked toward him. As she approached Castaneda, he slowly sat up, and she noticed he was bleeding profusely from his face. Solideo told Castaneda to stay seated; he disobeyed her, stood up, and fell into the street. Solideo stepped into the street to block oncoming traffic. Castaneda stood up again and walked slowly through the parking lot, disobeying Solideo's command to stop. Solideo followed him. She became concerned when he reached for his front waistband because she thought he might have a weapon. Castaneda started running through the parking lot and turned into an alley. Solideo caught up with him, grabbed his waistband, and brought

5

him to the ground. He grabbed at her legs. As Solideo pulled her Taser out of its holster, Castaneda stood and assumed a fighting stance with hands curled into fists. When Castaneda lunged at Solideo, she "Tased" him. Castaneda fell, then got back up and ran. Solideo "Tased" him again. He continued to run. Several other police officers joined the pursuit and eventually apprehended Castaneda.

Another suspect, Marcos Barona, was also taken into custody a short distance from the crime scene. Cruz, who had escaped apprehension, appeared at a police station on July 26, 2010 to talk about the case. Cruz gave a brief statement to police after being read his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

## II.

### Barona's Police Interview

Santa Ana Police Detective Clinton Achziger interviewed Barona starting at about 6:00 a.m. on July 25, 2010.[3] During the interview, Barona said he, Castaneda, and Cruz went to a minimart to buy beer. From the minimart, Barona and Castaneda walked to the Taqueria De Anda restaurant to use the restrooms, which, as it turned out, were not working. When Barona and Castaneda walked back outside, they saw Cruz doing a "hit-up" of a group of people standing next to a black SUV.[4] Castaneda ran over

---

[3] Barona, who was charged with first degree murder, testified for the prosecution under a grant of immunity. Barona denied any relationship with a gang despite having a gang tattoo on his neck. He claimed not to remember the events of July 25, 2010 or the police interview and testified he did not even know of a Taqueria De Anda restaurant. His answer to most questions posed to him was "I don't know" or "I don't remember." The trial court found Barona was intentionally evasive and permitted the prosecution to impeach him with Achziger's testimony about Barona's prior inconsistent statements made during the police interview. (See Evid. Code, § 1235.)

[4] A hit-up occurs when a gang member asks someone, "where you from," meaning to identify his or her gang. It is considered a challenge.

6

to help Cruz. Barona heard either Castaneda or Cruz shout the gang name, Los Compadres, and someone shout back, "Brown" (possibly referring to a tagging crew).

After the hit-up, Barona ran over to Castaneda and Cruz to act as backup, but did not join in the verbal confrontation. Instead, Barona claimed he tried to "mediate" by telling the wedding guests "it's cool" and they could eat tacos. Castaneda started a fistfight and Cruz joined in. Just three or four seconds later, Barona heard gunshots. Barona did not know who the shooter was or where he came from.

Barona admitted being a Los Compadres gang member. He had joined the gang 20 years earlier. His gang moniker was "Silent." He said that Castaneda and Cruz were Los Compadres gang members too.

### III.

### Expert Testimony on Criminal Street Gangs

Achziger testified as an expert on criminal street gangs. His qualifications as a gang expert are not disputed.

Achziger's opinions, as relevant to this appeal, included the following:

1. Los Compadres is a criminal street gang in Santa Ana. It is sometimes called "Los Comps," "Westside Santa Ana Los Comps," or "W.S.L.C."

2. Cruz, Castaneda, and Barona were active members of the Los Compadres gang as of July 25, 2010.

3. The Taqueria De Anda restaurant at which the shootings occurred is within the claimed territory of the Los Compadres gang.

4. Gang members share firearms with other gang members. A gang often will have a "gang gun" that is kept by one gang member. Other gang members can retrieve the gang gun when needed. Gang members let each other know where the gang gun is being kept.

7

5. A hit-up occurs when a gang member asks someone, "where you from," meaning to identify his or her gang. It is considered a challenge. Achziger explained that in a hit-up, "[y]ou're challenging that person to see if they're going to represent their gang."

6. A person who is the subject of a hit-up, even if not a gang member, could be robbed, beaten, stabbed, or forced out of the area.

7. Hit-ups often result in a shooting. Most of the murder cases Achziger investigated started with a hit-up.

8. Gang members are more likely to conduct a hit-up within their gang's claimed territory. Sometimes hit-ups are planned, and sometimes they are "crimes of opportunity."

9. Gang members act as "backup" for fellow gang members. Achziger explained: "[I]f gang member A picks a fight and starts to lose, his backup is going to jump in and now also participate in the fight."

## DISCUSSION

### I.

### Substantial Evidence Supported Convictions for Second Degree Murder and Second Degree Attempted Murder.

The decision in *Chiu* forecloses punishing Castaneda and Cruz for first degree premeditated murder and first degree attempted murder, but leaves open the issue whether substantial evidence supported convicting them of second degree murder and second degree attempted murder. "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of

8

fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] . . .'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

Castaneda and Cruz were prosecuted and convicted as aiders and abettors under a natural and probable consequences theory. "An aider and abettor is one who acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" (*Chiu*, *supra*, 59 Cal.4th at p. 161.) "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation]. Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).)

For a consequence to be reasonably foreseeable, it is enough that the consequence was probable and might reasonably have been contemplated. (*Medina*, *supra*, 46 Cal.4th at p. 920.) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*Ibid.*)

In *Medina*, *supra*, 46 Cal.4th at page 917, three gang members (Jose Jesus Medina, George J. Marron, and Raymond Vallejo) hit up the victim (Ernie Barba) by

9

asking him, "'[w]here are you from?'" Viewing Barba's response to the question as disrespectful, Vallejo punched Barba, and Medina and Marron joined in the fight. (*Ibid.*) Though outnumbered, Barba held his own against the assailants. Eventually, another person (Manuel Ordenes) was able to pull Barba away and escort him and his friend to his car. Ordenes advised Barba to leave. (*Ibid.*) Someone yelled, "'get the heat.'" (*Ibid.*) As Barba drove off, Medina stepped into the middle of the street and fired a gun repeatedly at Barba's car. Barba died of a gunshot wound to the head. (*Ibid.*)

The jury convicted Medina of murder and attempted murder as the perpetrator and convicted Vallejo and Marron of murder and attempted murder as aiders and abettors. (*Medina*, *supra*, 46 Cal.4th at pp. 916, 917, 919.) The Court of Appeal reversed the convictions of Vallejo and Marron on the ground there was insufficient evidence that the nontarget crimes of murder and attempted murder were a reasonably foreseeable consequence of the target offense of simple assault. (*Id.* at p. 919.)

The California Supreme Court reversed the Court of Appeal and affirmed the convictions. (*Medina*, *supra*, 46 Cal.4th at pp. 916, 928.) The Supreme Court reasoned the evidence established that the question "'where are you from'" was a challenge that could lead to a physical altercation and even death. (*Id.* at p. 922.) When attacked for showing disrespect, Barba exhibited strength against the three aggressors, who were prevented from avenging themselves. (*Ibid.*) The Supreme Court concluded, "the jury could reasonably have found that a person in defendants' position (i.e., a gang member) would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable as Barba was retreating from the scene." (*Id.* at pp. 922-923.) The Supreme Court stated it was not necessary for the assailants to have used weapons during the fistfight, for the gangs involved to have had an ongoing rivalry, or for Vallejo and Marron to have known that Medina was armed. (*Id.* at pp. 922-924, 927.)

10

The evidence here presented the quintessential case of a gang hit-up escalating into a murder and attempted murder. Indeed, this case has striking similarities to *Medina*. The victims, Jose and David, and the other wedding guests were in the parking lot of a Taqueria De Anda restaurant within the territory claimed by the Los Compadres gang. Cruz and Castaneda, both Los Compadres gang members, approached the group and conducted a hit-up. Cruz asked, "[w]here you from?" (the classic hit-up line) and yelled, "Westside Compadres," while Castaneda announced he was "Creeper" and told the wedding guests they could not eat there.

The hit-up escalated into a verbal confrontation. Castaneda shouted something in the direction of the alley and appeared as though he were trying to contact someone: A reasonable inference (supported by expert testimony) is Castaneda was calling for armed backup. Someone else made a cell phone call. The verbal confrontation escalated to a fight. Castaneda attacked David, who (like Barba in the *Medina* opinion) fought back, held his own, and even knocked Castaneda to the ground. Jose Angel Quiroz and Martinez joined in the fight.

Within moments, two men—the backup called by Castaneda—appeared and ran toward the Suburban. One of the two backup men carried a gun: A reasonable inference, which we presume the jury drew, is that the gun was the gang gun. The fistfight escalated into gunfire. The gunman shot David, then turned his aim and fired five times in the direction of Jose, who was shot dead. All the assailants fled, except for Castaneda, who was injured.

Castaneda argues he did not know, and could not reasonably have known, that someone would "c[o]me out of the shadows and start[] shooting." A reasonable inference from the evidence, however, is that Castaneda summoned backup and, in response, two men, one of whom carried the gang gun, ran to the scene. We presume the jury inferred those facts, from which the jury could reasonably have found that Castaneda and Cruz "would have or should have known that retaliation was likely to occur and that

11

escalation of the confrontation to a deadly level was reasonably foreseeable." (*Medina*, *supra*, 46 Cal.4th at p. 923.) Moreover, it was not necessary for Castaneda or Cruz to have known their backup would be armed. (*Id.* at p. 924.)

Cruz argues the evidence does not support second degree murder and second degree attempted murder convictions because none of the victims in this case was a gang member and "there is nothing to suggest any ongoing rivalry or ill-will between Los Compadres and the victims." It was not necessary for there to have been a rivalry between the victims and Los Compadres (*Medina*, *supra*, 46 Cal.4th at p. 923) and, as Achziger testified, anyone who is the subject of a hit-up, whether or not he or she is associated with a gang, faces violence for any perceived disrespect.

Cruz argues he was unarmed at the time he made the hit-up, there was no evidence he knew of weapons in the area or that anyone nearby had a gun, and, accordingly, "[t]hat an unknown armed assailant would approach and open fire could not have been reasonably foreseeable." We conclude otherwise.

An analogous situation arose in *People v. Montes* (1999) 74 Cal.App.4th 1050 (*Montes*), an opinion from a panel of this court. In that case, the defendant and other members of the Orange Krazy Mexicans (OKM) gang were hanging out in the parking lot of a fast-food restaurant when Jorge Garcia, a former member of a rival gang, Eduardo Flores, and two women drove up. (*Id.* at p. 1053.) Garcia expected trouble. Two months earlier, the defendant and another OKM gang member had confronted Garcia and Flores at the same restaurant, and, during that confrontation, the defendant had struck Flores in the head with a stick. (*Ibid.*) This time, the defendant doused Garcia's car with a soft drink and yelled, "'Fuck VPL [(Varrio Pelones Locos)].'" (*Ibid.*) Garcia parked his car and got out but found himself surrounded by the defendant and his cohorts. (*Ibid.*) Garcia pulled out a switchblade, but the defendant had a thick, three-foot-long chain which he used to strike Garcia in the shoulder. (*Ibid.*) Flores yelled "something about a gun," causing the defendant and other OKM gang members to

12

retreat to their car. (*Ibid.*) Flores retrieved a pipe from Garcia's car and threw it toward the OKM gang members. Flores and Garcia then got into their car, but before they could drive away, an OKM gang member named Arturo Cuevas retrieved a gun from a nearby vehicle, ran up to Garcia, and shot him several times. (*Ibid.*) The defendant was convicted of attempted murder as an aider and abettor under the natural and probable consequences theory with the target offenses of assault with a semiautomatic firearm, simple assault, or breach of the peace. (*Id.* at pp. 1052, 1054.)

On appeal, the defendant argued that simple assault and breach of the peace were erroneously included as target offenses because there was no evidence he knew Cuevas was armed. (*Montes*, *supra*, 74 Cal.App.4th at p. 1054.) The Court of Appeal, affirming, concluded the target offenses of simple assault and breach of the peace were not trivial but arose "in the context of an ongoing rivalry between OKM and VPL during which the two gangs acted violently toward each other." (*Id.* at p. 1055.) The confrontation in the parking lot was, "[f]rom the start, . . . punctuated by threats and weaponry." (*Ibid.*) When the defendant and his fellow gang members got the upper hand in the fight, Flores shouted for a gun, prompting Cuevas to retrieve a firearm and shoot Garcia. (*Ibid.*) A gang expert explained those facts "represent a textbook example of how a gang confrontation can easily escalate from mere shouting and shoving to gunfire." (*Ibid.*) Thus, the target offenses of simple assault and breach of the peace were closely connected to the shooting. (*Ibid.*)

The crimes in this case were not the result of a confrontation between rival gangs. In that way, this case differs from *Montes*. Despite that difference, *Montes* remains sufficiently analogous to support the conclusion that Cruz could reasonably foresee his conduct might lead to murder and attempted murder. Cruz and Castaneda were members of Los Compadres gang. Cruz initiated a hit-up of the wedding guests; similarly, the defendant in *Montes*, a member of the OKM gang, initiated the confrontation by yelling, "'[f]uck VPL.'" (*Montes*, *supra*, 74 Cal.App.4th at p. 1053.)

13

Hit-ups often escalate into a shooting; in fact, most of the murder cases Achziger investigated started with a hit-up. Cruz's hit-up quickly escalated into a knock-down, drag-out fight, just as the confrontation in *Montes* escalated into a fight with the defendant striking Garcia with a chain and Flores throwing a piece of pipe. Gang members act as backup for fellow gang members, and backup might be called when a gang member is losing a fight. In both this case and *Montes*, it was reasonably foreseeable that backup would be called. Cruz and Castaneda were losing the fight, while in *Montes*, the OKM gang members retreated when Flores yelled something about a gun.

Here, as in *Montes*, it was reasonably foreseeable that backup would arrive armed. A gang often will have a gang gun kept by one gang member, and gang members let each other know where the gang gun is being kept. In *Montes*, there was no evidence that the defendant knew specifically that Cuevas had a gun, but the court found that "immaterial" in light of "the great potential for escalating violence during gang confrontations." (*Montes*, *supra*, 74 Cal.App.4th at p. 1056.) Likewise here, it is immaterial whether there was evidence that Cruz specifically knew that backup would arrive with a gun.

There is no question that Castaneda and Cruz aided and abetted the target offenses of assault, battery, and breach of the peace. The nontarget offenses of murder and attempted murder were a natural and probable consequence of those target offenses. "In examining the whole record in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the shooting of the victim[s] was a reasonably foreseeable consequence of the gang assault in this case." (*Medina*, *supra*, 46 Cal.4th at p. 922.) The evidence therefore supported convicting Castaneda and Cruz of second degree murder and second degree attempted murder. In accordance with *Chiu*, *supra*, 59 Cal.4th 155, the prosecutor may elect to accept a reduction in convictions on counts 1 and 2 to second degree or to retry the greater offenses.

14

**II.**

**The Prosecutor Did Not Commit Misconduct During
Closing Argument or the Misconduct Was Cured
Through Admonishment and Jury Instructions.**

Cruz argues the prosecutor committed misconduct during closing argument and identifies four instances of such misconduct. Those four instances fall into three categories: (A) drawing attention to his failure to testify and attempting to shift the burden of proof to the defense; (B) comments on post-*Miranda* statements made to the police; and (C) appeals to sympathy for the victim, Jose. Each category is discussed in turn below. We conclude either the prosecutor did not commit misconduct or the misconduct was cured through admonishment and jury instructions.

A. *Drawing Attention to Defendants' Failure to Testify and Attempting to
Shift the Burden of Proof to the Defense*

1. *The Prosecutor's Comments*

During closing argument, the prosecutor argued: "And they don't have to do anything. Right? We heard about this a lot in voir dire. Defense does not have to present any defense or any evidence or do anything. They don't even have to question the witnesses. They don't have to do a darn thing. I have the complete burden of proof. [¶] But if they thought that there was a witness they could call [who] would support the defense they presented, they have the right and the ability to do that. They can subpoena any documents, any witness, anything if they think it would help their case. So if they thought there was another witness [who] would provide evidence that would support these claims, they can do that. And that didn't happen. You didn't hear that evidence in this case."

During a break outside the jury's presence, Cruz's counsel made an objection based on prosecutorial misconduct in that "[t]he district attorney is shifting the burden to the defendant." The trial court sustained the objection with the firm

15

explanation: "Well, we have a problem. And the problem is the prosecutor's comment that the defense has the ability to call any witnesses [who] would support their defense. It is so obvious in this case that the People called everybody at the scene. I mean, everyone. And the only three people who are not called [were] the shooter who is unidentified, Mr. Cruz, and Mr. Castaneda."

As a remedy, Cruz's counsel asked the trial court to grant a mistrial or admonish the jury. The court denied a mistrial and admonished the jury instead. When the jurors returned after the break, the court told them: "Ladies and gentlemen, there was a comment by the prosecutor, words to the effect that if the defense thought there was a witness who could support the defense, they could call them. At this time, I'm going to ask you or I'm going to order that you not consider that statement. The court is going to be instructing you, as we indicated during jury selection, that a defendant, an accused has an absolute constitutional right not to testify, and I'm ordering you at this time, you're obviously aware the defendants did not testify. You're not to discuss that. You're not to consider that in any way in determining your verdict in this case."

During rebuttal, the prosecutor argued: "And so you have to make this decision just based on fairness, ladies and gentlemen. Fair trial. Demands a fair verdict. These defendants have had all of their rights upheld in this process. They've had the right to remain silent. They've had the right to attorneys. They've had the right to a preliminary hearing. They've had a right to continue to remain silent at trial and a right to present any—." At that moment, Cruz's counsel made an objection based on prosecutorial misconduct. All defense counsel moved for a mistrial.

Outside the jury's presence, the court denied the motion with a warning to the prosecutor: "I'm going to admonish the People not to mention that right anymore. The danger of mentioning it is that you're advocating . . . either intentionally or, as I believe, unintentionally, the concept that their silence in this case is somehow relevant and it's just not. It's just not. You just got to stay away from it. [¶] And in denying the

16

motion for a mistrial, I've taken into account the totality of the circumstances, that it is my firm belief that this jury will not use your comments on these two occasions for an improper purpose and that improper purpose is to use the silence of the defendants at their trial for an improper purpose."

When the jurors returned, the trial court admonished them: "Ladies and gentlemen, the last comments of the prosecutor about the defendant's right to remain silent, once again, I'm going to admonish you . . . that you're not to even consider the fact of the defendant not testifying at all in anything. So when you go back to the jury room, you're not to discuss it and you're not to allow that fact to be considered by you in any way."

2. *Relevant Law of Prosecutorial Misconduct*

A prosecutor commits misconduct by using deceptive or reprehensible methods to persuade a jury. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427.) When a claim of misconduct is based on a prosecutor's statements to a jury, we consider whether it is reasonably likely the jury construed or applied any of the challenged statements in an objectionable fashion. (*Ibid.*)

A prosecutor may not comment on a defendant's failure to testify (*Griffin v. California* (1965) 380 U.S. 609, 615) and may not attempt to shift the burden of proof to the defendant (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340). But, as a general rule, a prosecutor may comment on a defendant's failure to introduce material evidence or call logical witnesses. (*People v. Wash* (1993) 6 Cal.4th 215, 262-263; *People v. Ratliff* (1986) 41 Cal.3d 675, 691.) "[I]t is neither unusual nor improper to comment on the failure to call logical witnesses." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) In *People v. Bradford*, *supra*, 15 Cal.4th at page 1339, the Supreme Court concluded that the prosecutor did not commit misconduct during closing argument by making "brief comments" noting the absence of evidence contradicting the prosecution's evidence and the defense's failure to present material evidence or alibi witnesses. The court explained:

"A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Id.* at p. 1340.)

### 3. *No Misconduct/Any Misconduct Not Likely to Mislead Jury*

In our view, the prosecutor's statements regarding the failure of Castaneda and Cruz to present exculpatory documents and witnesses did not constitute improper comment on their failure to testify or an attempt to shift the burden of proof. Castaneda and Cruz argue, and, indeed, the trial court expressed concern, that the prosecutor's comments by implication violated *Griffin v. California*, *supra*, 380 U.S. 609, and were an improper attempt to shift the burden of proof because the prosecutor had called all possible eyewitnesses to testify at trial. This argument is unpersuasive because, as the Attorney General points out, not all possible witnesses testified. Among those not testifying were the two men (one of whom carried the gun) who ran toward the Suburban from the alley and the two women and the man who had walked over from the nearby minimart. Neither Castaneda nor Cruz presented expert witnesses. Because not all possible witnesses were called to testify at trial, there was no reasonable likelihood that the jury construed or applied the prosecutor's comments in an objectionable way.

The trial court sustained defense counsel's first objection and twice admonished the jury not to consider the fact Castaneda and Cruz did not testify. "The admonishment was clear, and fully sufficient to cure any harm." (*People v. Gonzales*, *supra*, 54 Cal.4th at p. 1275.) Later, the court instructed the jury that the prosecution had the responsibility to prove all elements of a crime beyond a reasonable doubt (CALCRIM Nos. 103, 220) and that the jury must follow the instructions if in conflict with counsel's argument (CALCRIM No. 200). "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the

18

law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717.) We presume the jury understood and followed the jury instructions. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.)

### B. *Comments on Post-*Miranda *Statements to Police*

The prosecutor argued: "Cruz gives a statement to the police. He doesn't say, 'oh, my gosh, there was a shooting and I didn't know who that guy was or how that happened.' He minimizes the whole thing. He lies and just says there is a fight." Defense counsel did not object.

Failure to object or request an admonition leads to forfeiture of a claim of prosecutorial misconduct unless an objection or request for admonition would have been futile. (*People v. Young* (2005) 34 Cal.4th 1149, 1188.) We exercise our discretion, however, to consider Cruz's claim of prosecutorial misconduct to avert a claim of ineffective assistance of counsel. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146; see *People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6 [appellate court has discretion to consider issue not preserved for review if issue is based on undisputed facts].)

A prosecutor may not comment on a defendant's silence following *Miranda* warnings. (*Wainwright v. Greenfield* (1986) 474 U.S. 284; *Doyle v. Ohio* (1976) 426 U.S. 610; accord, *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 64-65.) In this case, the prosecutor did not comment on Cruz's *silence* but commented on Cruz's *statements* and how those statements indicated guilt. No misconduct occurred.

### C. *Appeals to Sympathy for the Victim*

During rebuttal argument, the prosecutor argued: "[T]he crazy thing about this trial, pretty much every murder trial is you barely he[ar] anything about the victim, the most important person who lost his life in a tragic, senseless, violent way. He had a family." Cruz's counsel made an objection, which the trial court sustained. The prosecutor continued: "[Jose] had a life. We didn't get to hear much about that life. You

19

didn't get to hear much about it because, unfortunately, it's not relevant to the decision that you're going to make. But he was a human being and his . . . only choice that night was to eat tacos and that was his fatal choice, and that's not right. You shouldn't die over trying to eat some tacos with your family and friends." Cruz's counsel objected. The court overruled the objection.

It is improper for the prosecutor to appeal for sympathy for the victim. (*People v. Martinez* (2010) 47 Cal.4th 911, 957.) In *People v. Kipp* (2001) 26 Cal.4th 1100, 1129, the prosecutor argued, "'[s]o when you think about the elements of the offense of murder, as you will when you go back to deliberate, and as we, perhaps in somewhat of a legal abstract sense, the element satisfied a human being was killed. [¶] If you would, think for a moment about what it means. A living, breathing human being had all of that taken away.'" The Supreme Court concluded the prosecutor's argument was an improper appeal to sympathy because it invited the jury "to reflect on all that the victim had lost through her death." (*Id.* at p. 1130.) The misconduct did not warrant reversal because the comment was "brief, mild, and not repeated" and the evidence of guilt was strong. (*Ibid.*)

In this case, the prosecutor's appeals to sympathy also were "brief, mild, and not repeated" (*People v. Kipp*, *supra*, 26 Cal.4th at p. 1130), and the prosecutor did not tell the jurors anything they did not already know—that the victim was a human being who had a family. The prosecutor told the jurors that Jose's life was not relevant to its decision, and the court instructed the jury not to let sympathy influence its decision. We presume the jury understood and followed the jury instructions. (*People v. Gonzales*, *supra*, 51 Cal.4th at p. 940.)

## DISPOSITION

The convictions on count 1 and count 2 are reversed. In accordance with *Chiu*, *supra*, 59 Cal.4th 155, this matter is remanded to the trial court with directions to

20

allow the People to accept a reduction of the convictions on count 1 to second degree murder and on count 2 to second degree attempted murder, or to elect to retry Castaneda and/or Cruz for first degree murder and/or first degree attempted murder under theories other than natural and probable consequences.  The convictions on count 3 are affirmed. If the People accept the reduction of the convictions on counts 1 and 2, then the true findings on the enhancements are affirmed, and Castaneda and Cruz shall be resentenced.


                                    FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.